Timothy Elder, Bar No. 29434
TRE Legal Practice, LLC
4226 Castanos Street
Fremont, CA  94536
Telephone:  (410) 415-3493
Facsimile:  (888) 718-0617
E-mail:  telder[at]trelegal.com

Attorney for Plaintiffs

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JUSTIN HULL and AMY SWEIGARD, <br><br> Plaintiffs, <br><br> v. <br><br> MARRIOTT INTERNATIONAL, INC. <br><br> Defendant | Case No. <br><br> COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Justin Hull and Amy Sweigard allege as follows:

## INTRODUCTION

1. This is an action for relief arising from the Defendant employers' violations of the Plaintiffs' civil rights in contravention of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101, et seq.

2. Plaintiffs are former Marriott employees with disabilities who rely upon screen access software to use computers on the job.  Screen access software, commonly used by persons who are blind or visually impaired or who have print disabilities, translates visual information and text displayed on a computer screen into audible synthesized speech or refreshable Braille data.  This technology enables persons with disabilities to

access documents and other digital information on a computer and thus become productive and independent workers.

3. Marriott recruits individuals with disabilities for entry-level positions at its sales and reservation call centers throughout the United States.  Plaintiffs are blind and were hired as entry-level call center employees.  Plaintiffs have sought promotional and other employment opportunities at Marriott.

4. Through its actions and decisions with respect to procurement, installation, and configuration, Marriott has failed and refused to ensure the accessibility of its job-related software programs and technology systems to persons with disabilities who use screen access software.  As a result, applicants and employees with disabilities, including Plaintiffs, have been and are being denied equal employment opportunity.

5. Persons with disabilities who use screen access software have complained to Marriott that they have been denied employment opportunities because of the unnecessarily inaccessible configurations of Marriott's software programs and technology systems.  Marriott has failed to respond effectively to these concerns.

6. Plaintiffs Hull and Sweigard seek declaratory and injunctive relief, lost compensation and other employment benefits, compensatory and punitive damages, and reasonable attorneys' fees and costs, for Defendant's violations of their rights.

## JURISDICTION AND VENUE

7. This court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202.  This is an action arising under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*.

8. Venue is proper in the District of Maryland pursuant to 42 USC 2000E-5(f)(3), because the unlawful employment practices complained of occurred in this District, and/or because the records relevant to these practices are maintained and administered in this District.

# PARTIES

9. Plaintiff Justin Hull is a blind resident of Tucson, Arizona, and is a person with a disability under the ADA.

10. Plaintiff Amy Sweigard is a blind resident of Omaha, Nebraska, and is a person with a disability under the ADA.

11. Plaintiffs have records of disability within the meaning of these laws. Plaintiffs are informed and believe, and thereon allege, that Defendant regards them as disabled within the meaning of these laws.

12. Defendant Marriott International ("Marriott") is a leading hospitality company with 19 hotel brands, over 100,000 employees and associates at more than 3,800 managed and franchised properties around the world, and has reported revenues of nearly $12 billion in fiscal year 2012. Marriott is incorporated in Delaware and headquartered in Maryland. It operates several sales and reservation call centers across the country and over 1,000 Marriott properties. According to its Form 10K, for the properties it operates, Defendant is "responsible for hiring, training, and supervising the managers and employees required." Marriott is an entity covered by the ADA.

13. Plaintiffs Justin Hull and Amy Sweigard are informed and believe, and thereupon allege, that they were employed by Marriott.

# EXHAUSTION OF ADMINISTRATIVE REMEDIES

14. On or about June 19, 2013, Plaintiff Amy Sweigard filed her Charge of Discrimination with the EEOC and simultaneously requested an immediate right to sue on her claims. Her charge alleged that she was subject to disability-based discrimination. She further alleged that similarly situated employees with disabilities were also denied promotional and other employment opportunities on the basis of disability.

15. On or about September 13, 2013, Justin Hull filed his Charge of Discrimination with the EEOC and simultaneously requested an immediate right to sue on his claims.

Like Plaintiff Sweigard, his charge alleged that he and other employees and applicants with disabilities were also denied promotional and other employment opportunities on the basis of disability.

16. On or about September 30, 2013, Plaintiffs Sweigard and Hull renewed their requests for an immediate right to sue letter from the EEOC. Plaintiffs received their immediate right to sue letter from the EEOC on November 4, 2013.

## STATEMENT OF FACTS

17. Disabled persons such as Justin Hull and Amy Sweigard use software referred to as "screen readers" or "screen access software" to access and use computers, including at work. Screen access software takes information that is displayed on the video screen and makes it available non-visually to disabled users. Screen readers monitor the computer screen and convert the information displayed into audible synthesized speech or into dynamic Braille on a device known as a "refreshable Braille display." This technology enables employees who are blind or visually impaired or who have print disabilities to independently access many commercial software applications with efficiency, and thereby to obtain and retain meaningful employment in a wide range of professions and industries.

18. From the time of their hiring and throughout their employment at Marriott, Plaintiffs used computers and software programs to perform their job functions by relying on a screen access software program called Jobs Access with Speech ("JAWS"). This screen access software enables Plaintiffs to manipulate textual data on their computers and to locate relevant information stored in Marriott's electronic databases with efficiency. Plaintiffs and other Marriott employees with disabilities use JAWS and/or similar screen access programs to successfully perform job duties at Marriott.

19. While JAWS and other screen readers work well with many different software interfaces, it is possible to configure software with a graphical user interface that inhibits the amount of information on the computer screen that the screen reader can directly

access. If the screen reader cannot directly access the information displayed on the visual computer screen, then it becomes necessary to write scripts or to make other changes to the configuration of the software program in order to enable the screen reader to understand the needed information on the screen. For example, screen readers cannot translate pictures or pictures of text unless the graphical image is properly embedded with the textual equivalent of the picture.

20. Marriott is aware of the needs of its disabled employees who use JAWS and other similar screen access programs. Marriott intentionally configures certain software programs used by entry-level call center employees to be accessible to employees with disabilities who use JAWS. However, without a business necessity, Marriott has failed to ensure that its other software programs are also accessible to workers using JAWS. This disregard for the accessibility of job-related software other than for a small number of applications used in entry-level positions screens out or tends to screen out disabled applicants and employees who use screen access technology from employment opportunities compared to nondisabled applicants and employees.

21. Marriott has received complaints from blind employees that its configuration of various software programs has the effect of denying job opportunities to employees and applicants with disabilities who use screen readers. Despite such complaints, Marriott continues to configure software programs and technology systems with reckless indifference to the rights of disabled employees and applicants. Marriott makes these discriminatory decisions about software procurement and configuration from its principal office in Bethesda, Maryland.

22. As a result of Marriott's implementation of inaccessible software at the corporate level, local Marriott managers engage in a pattern or practice of bias against Plaintiffs and other disabled applicants and employees who use screen access software. This bias includes, but is not limited to, the following actions: steering qualified employees and applicants with disabilities away from advancement and other employment

opportunities; refusing to interview disabled candidates who use screen access software; rejecting qualified employees and applicants for advancement or other employment opportunities because they use screen access software; redistributing work assignments of disabled employees who use screen access software to nondisabled colleagues; underutilizing disabled employees who use screen access software; and failing to provide reasonable accommodations needed by disabled employees and applicants to overcome inaccessible software configurations.

23. Effective, less discriminatory alternatives to Marriott's inaccessible configuration of software programs include:

    (a) replacing inaccessible software programs with alternative software that is accessible to screen access programs;

    (b) updating and upgrading the existing software to make it accessible to screen access programs system-wide; and

    (c) adding individualized modifications or scripts to the existing inaccessible software to make it accessible to identified individuals with disabilities who use screen access software.

24. According to published reports, Defendant Marriott International had revenues of $12.3 billion for 2011, and has assets worth $5.9 billion.

## Justin Hull

25. In or about May 2010, Marriott hired Plaintiff Hull as a reservation specialist in its Salt Lake City call center. After approximately nine months in Salt Lake City, he transferred to another Marriott call center in Omaha, Nebraska. He has worked as a reservation agent for several "desks" (departments) within these Marriott call centers. On July 31, 2013, he left Marriott because of Marriott's discriminatory treatment of its blind employees. In the fall of 2013, he moved to Tucson, Arizona, to take a job with Citibank.

26. Plaintiff Hull used JAWS to successfully perform all of his job duties including

using a computer to answer calls from potential Marriott customers, booking reservations, and performing other tasks as assigned.

27. In or about September 2012, Plaintiff Hull began inquiring about a posted opening in the Customer Service department. He spoke with his manager, Justin Radke, about the position. Mr. Radke told him that he had emailed the hiring manager from the Customer Service department on Hull's behalf. The hiring manager for Customer Service, sent Mr. Radke an email stating that an interview wouldn't be appropriate because the Lotus Notes software used by the department was not accessible with screen access software and would not become accessible, if at all, until 2015. Based on the hiring manager's advice, Mr. Radke suggested that Plaintiff Hull not submit his application. Plaintiff Hull was never given an opportunity to test the accessibility of Lotus Notes or to discuss potential reasonable accommodations that might enable him to work in the customer service department.

28. Lotus Notes can be configured so that it is accessible with JAWS.

29. In or about February 2012, Plaintiff Hull applied for an open position at Marriott's Platinum Desk in the Omaha call center. The job duties of a Platinum Desk agent are virtually the same as other desks, except the agents must use the CRIS and IMS software programs to manage the rewards accounts of callers. Working the Platinum Desk is a desirable position because agents are paid a higher wage. In addition, Platinum callers usually spend more money on reservations, which positively affects the agents' productivity scores.

30. Although Plaintiff Hull was well qualified for the Platinum Desk, his application was rejected. He asked his managers why his application was rejected. Managers Joy Held and Melissa Peeler stated that the Platinum Desk requires the use of the CRIS and IMS software, and that this software was not currently accessible with screen access software.

31. Plaintiff Hull could have performed the functions of the Platinum Desk position

with modifications to the configuration of the CRIS and IMS software programs and appropriate reasonable accommodations. When Plaintiff Hull asked management if anything could be done to make the applications accessible, Manager Held stated that the "issue was being worked on," but that she could not discuss any specifics with him. Plaintiff Hull followed up over the following year but never learned of any progress on the accessibility of the software. He was never allowed to test the CRIS and IMS software to determine how accessible it might be.

32. In April of 2013, Plaintiff Hull began expressing interest in an open position at the lead desk to his Department Manager, Rusty Nelson. The job duties of the Lead Desk include assisting reservation agents when they have questions about calls and handling certain uncommon customer issues. Given Plaintiff Hull's experience at Marriott call centers, he was well qualified for this position. In April 2013, the hiring manager for the Lead Desk, Dan Luneke, sent Plaintiff Hull an email explaining that they would evaluate the accessibility of their software and get back to him when it was determined to be accessible to blind applicants. Near the end of June 2013, he again followed up with management and was informed by an email on June 27 that he would not be given any opportunity to train or move into this position "until we know that JAWS will read the systems we use on the lead desk."

33. Plaintiff Hull was never given an opportunity to test the accessibility of the applications used at the lead desk or to discuss potential reasonable accommodations that might enable him to overcome any inaccessibility of Marriott's software configuration.

34. In June 2013, Plaintiff Hull applied for an open position in the Group Housing department. The hiring manager, Karen Leighton, sent him an email on June 23, 2013, stating that she would not interview him for the position because "the Property Management software that is required for use as a member Group Housing Department is not compatible with JAWS at this time."

35. Plaintiff Hull was discouraged and deterred from applying for additional open

positions based on Marriott's practice of purchasing and requiring the use of inaccessible software for many jobs, and limiting disabled employees to certain jobs that do not use such software. Based on Plaintiff Hull's experiences, he understands that Marriott unfairly refuses to consider qualified disabled applicants because they might require reasonable accommodations or modifications to company software.

36. Plaintiff Hull is aware of disabled employees who use screen access software at each of Marriott's several regional reservation call centers who are facing similar barriers to advancement. Several current and former disabled employees who have worked at these call centers have shared with Plaintiff Hull their experiences at Marriott, including the barriers to advancement they have experienced. Some of these individuals have resigned, concluding that working in a Marriott call center as a blind employee is a dead-end job because they are not given the same opportunities as sighted employees to advance.

37. During his more than three years at Marriott, Plaintiff Hull has seen less qualified individuals with less seniority advance faster and more often than disabled employees who use screen access software.

38. Plaintiff Hull resigned as of July 31, 2013 to pursue other employment opportunities that will allow him to advance and reach his full potential. Plaintiff Hull is interested in returning to accept open positions at Marriott if Marriott would legitimately consider his application and ensure the accessibility of its company software.

### Amy Sweigard

39. In or about March 2011, Marriott hired Plaintiff Sweigard as a reservation specialist in its Omaha reservation call center. She used JAWS to successfully perform all of her job duties including using a computer to answer calls from potential Marriott customers, booking reservations and performing other tasks as assigned.

40. In September 2011, Plaintiff Sweigard reviewed a list of open promotion opportunities at Marriott that would allow her to advance within the company. At that

time, she applied for a promotion to the Internet Email Customer Care Department. The duties of this position included responding to email inquiries from customers. She was well qualified for this position.

41. The hiring manager for the position called Plaintiff Sweigard for an interview. During the interview, Plaintiff Sweigard disclosed that she was blind and would need to use her screen access software to do the job. The hiring manager rejected Plaintiff Sweigard's application, stating that the position required the use of Lotus Notes and that this software was not accessible to screen access users.

42. Marriott could have configured Lotus Notes to work with JAWS. Marriott could have offered other reasonable accommodations to allow Plaintiff Sweigard to perform the duties of this position. Marriott did not allow Plaintiff Sweigard to test the software for accessibility and did not discuss potential reasonable accommodations.

43. Around the same time that Plaintiff Sweigard was rejected by the Internet Email Customer Care Department, she inquired about several other advancement opportunities within the reservation call center, including positions at the Platinum desk, Scheduling Department and the Central Pod Office. Marriott manager Joy Held told Plaintiff Sweigard that these positions are not open to blind employees due to the purported inaccessibility of the software required to perform the jobs.

44. Also around that same time, Plaintiff Sweigard began searching for other advancement opportunities within departments where she was aware that Marriott had employed blind employees. She learned that blind employees had worked at the regional desk of the call center. She applied for the regional desk and was hired in February 2012. The regional desk performs essentially the same functions as the entry level position where all Plaintiffs started, except that the regional desk agents specialize in calls for hotels within the region.

45. In January 2013, after almost one year at the regional desk, Plaintiff Sweigard asked her regional desk manager, Pam Ernst, which positions at Marriott would be open

to hiring Plaintiff Sweigard as she sought to advance within the company. Ms. Ernst stated that the only positions at Marriott open to blind employees are the world-wide reservations desk and regional reservations desk. She explained that these are the only positions designed to be accessible for blind employees.

46. Nevertheless, in January 2013, Plaintiff Sweigard inquired by email about an open position in the quality assurance program. The job functions of the position include listening to the calls of Marriott reservation agents and giving them feedback on how they might improve their customer service skills. With nearly two years as a reservation specialist, she was well qualified for this position. She disclosed her disability to the hiring manager, Ms. Rose. Manager Rose stated that a disabled person using screen access software could not do the job because the position required the use of a software program called Tealeaf, which she described as not accessible using screen access software.

47. Plaintiff Sweigard could have performed the functions of that position with modifications to the software and/or appropriate reasonable accommodations. Marriott did not allow Plaintiff Sweigard to test the software for accessibility and did not discuss potential reasonable accommodations.

48. Plaintiff Sweigard is aware that current and former Marriott employees who use screen readers have been telling Marriott for years that it needs to consider the accessibility of any job-related software that it purchases, installs and configures so that disabled employees have an equal employment opportunity to advance. However, Marriott has been unresponsive.

49. Based on Plaintiff Sweigard's experiences, she understands that Marriott unfairly refuses to consider qualified disabled applicants because they might require reasonable accommodations or modifications to company software. There are currently open positions that Plaintiff Sweigard would like to apply and compete for on an equal basis with nondisabled employees. But she has been discouraged from seeking these jobs

based on Marriott's practices of purchasing and requiring the use of inaccessible software for many jobs, and then limiting disabled employees to certain jobs that do not use such software.

50. Frustrated by the lack of opportunity for advancement, Plaintiff Sweigard resigned from Marriott in June 2013. She desires to return to Marriott in the event that it changes its hiring practices and ensures that the configuration of its company software is accessible to disabled employees and applicants who rely on screen access technology.

## DECLARATORY RELIEF ALLEGATIONS

51. Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the complaint.

52. An actual controversy exists between Plaintiffs and Defendants concerning their respective rights and duties. Plaintiffs contend that Defendant violated their rights under the ADA. Plaintiffs are informed and believe, and thereupon allege, that Defendant denies that these actions were unlawful. Declaratory relief is therefore necessary and appropriate.

53. Plaintiffs seek a judicial declaration of the rights and duties of the respective parties, including a declaration of Defendant's duty to comply with the law.

## INJUNCTIVE RELIEF ALLEGATIONS

54. Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the complaint.

55. No previous application for the injunctive relief sought herein has been made to this Court.

56. If this Court does not grant the injunctive relief sought herein, Plaintiffs will be irreparably harmed.

57. No plain, adequate, or complete remedy at law is available to Plaintiffs to redress the wrongs addressed herein.

# FIRST CLAIM FOR RELIEF
Disability-Based Discrimination in Violation of
The Americans with Disabilities Act of 1990,
42 U.S.C. §§ 12112(a), (b)(1), (b)(3), (b)(5)(B), (b)(6), 12113(a)
On Behalf of Plaintiffs Hull and Sweigard

58. Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the complaint.

59. Plaintiffs Hull and Sweigard are "qualified individual[s] with a disability" as that term is defined by the ADA. 42 U.S.C. § 12111(8). They are able to perform the essential functions of their former positions with or without reasonable accommodations. They are also able to perform the essential functions of the positions they sought with or without reasonable accommodations.

60. The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to … other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

61. The ADA prohibits an employer from "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." 42 U.S.C. § 12112(b)(1).

62. The ADA prohibits an employer from "utilizing standards, criteria, or methods of administration – (A) that have the effect of discrimination on the basis of disability; or (B) that perpetuate the discrimination of others who are subject to common administrative control." 42 U.S.C. § 12112(b)(3).

63. The ADA prohibits an employer from "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(B).

64. The ADA prohibits an employer from using "selection criteria that screen out or

tend to screen out an individual with a disability or a class of individuals with disabilities" unless such criteria are shown to be job related and consistent with business necessity.  42 U.S.C. §§ 12112(b)(6), 12113(a).

65.  In violation of the rights of Plaintiffs, Defendant has implemented and is expanding a policy and practice of using and requiring the use of inaccessible software, and have excluded from employment and promotional opportunities disabled persons who cannot access the software in the same way as nondisabled employees.

66.  In so doing, Defendant has limited and classified Plaintiffs and other similarly situated disabled persons who cannot access the software in the same way as nondisabled persons so as to adversely affect the employment opportunities of disabled persons.

67.  In so doing, Defendant has utilized methods of administration that have the effect of discrimination against Plaintiffs and others similarly situated on the basis of disability.  Defendant has perpetuated disability discrimination by subjecting individuals to the common administrative control of systems relying upon unnecessarily inaccessible software.

68.  In so doing, Defendant has excluded Plaintiffs and others similarly situated from employment opportunities based upon their need for reasonable accommodations.

69.  In so doing, Defendant has used selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities. Without a job-related, business necessity justification, the requirement that Marriott employees be able to access software programs in the same way as nondisabled workers screens out and tends to screen out Plaintiffs from equal employment and promotional opportunities.

70.  Plaintiffs have suggested to Marriott and will demonstrate to the Court equally effective, less discriminatory alternatives to the existing inaccessible software, including:

   (a) replacing inaccessible software programs with alternative, accessible software;

    (b) updating and upgrading the existing configuration of the inaccessible software to make it accessible system-wide; and

    (c) adding individualized modifications or scripts to the existing inaccessible software to make it accessible to identified individuals with disabilities.

Such changes would impose no undue hardship to Defendant. They would not impede business necessity.

71. Defendant's unlawful actions and inactions were and are intentional and/or done with reckless disregard to the rights of Plaintiffs to be free from discrimination based on disability.

72. As a proximate result of the unlawful acts alleged herein, Plaintiffs have suffered injuries, including emotional distress injuries and lost employment opportunities.

73. Plaintiffs are entitled to compensatory damages, any lost benefits and compensation, injunctive and declaratory relief, and attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF
Interference in Violation of
The Americans with Disabilities Act of 1990,
42 U.S.C. § 12203(b)
On Behalf of Plaintiff Hull and Sweigard

74. Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the complaint.

75. The ADA prohibits "any person" from "interfer[ing] with any individual in the exercise or enjoyment of … any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

76. By implementing and expanding a policy and practice of using and requiring the use of an inaccessible configuration of software used by employees and associates, and by refusing to address the access problems raised by Plaintiffs and others, Defendants have interfered with the rights of Plaintiffs under the ADA.

77. Defendant's unlawful actions and inactions were and are intentional and/or

done with reckless disregard to the right of Plaintiffs to be free from discrimination based on disability.

78. As a proximate result of the unlawful acts alleged herein, Plaintiffs have suffered injuries, including emotional distress injuries and lost employment opportunities.

79. Plaintiffs are entitled to compensatory damages, any lost benefits and compensation, injunctive and declaratory relief, and attorneys' fees and costs.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully requests that this Court:

1. Grant all injunctive relief necessary to bring Defendant into compliance with the ADA;

2. Grant declaratory relief;

3. Order Defendant to pay Plaintiffs for any compensation denied or lost by reason of Defendant's violations of the law, in an amount to be proven at trial;

4. Order Defendant to pay Plaintiffs compensatory damages for emotional pain and suffering in an amount to be proven at trial;

5. Order Defendant to pay Plaintiffs' reasonable attorneys' fees, reasonable expert witness fees, and other costs of the action;

6. Order Defendant to pay interest on such damages as are appropriate, including pre- and post-judgment interest;

7. Grant such other and further relief as this Court may deem proper and just.

///

///

//

# JURY DEMAND

Plaintiffs demand trial by jury of all claims and causes of action so triable.

Respectfully submitted,

*Tim Elder*                                February 3, 2014

_____
Timothy Elder /s                           Date

Attorney for Plaintiffs
Email:  telder@trelegal.com